Filed 9/23/14  P. v. Lopez CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E058786 |
| v. | (Super.Ct.No. RIF148253) |
| RAUL LOPEZ, | **OPINION** |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County.  Richard A. Erwood, Judge.  Affirmed

James M. Kehoe, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Senior Assistant Attorney General, Arlene A. Sevidal, and Sean M. Rodriquez, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant Raul Lopez was appointed the Director of Transportation for the Coachella Valley Unified School District (district) in 1997. The transportation department (department) maintained and dispatched the yellow school buses and other vehicles, called the white fleet, owned by the district. It was discovered that between 2004 and 2007, defendant and the owner of Roman's Auto Body & Paint shop (Romans) submitted fraudulent invoices exceeding $75,000 for school bus repairs that were never performed and they split the money paid by the district. In addition, defendant authorized payments from the district's budget for automobile parts from NAPA Auto Parts (NAPA) that were not for school buses or other district vehicles but for cars that he repaired at his own auto repair business that he operated outside of work. Finally, he caused overtime sheets to be created and submitted them to the district for his girlfriend, Clemencia Ochoa,[1] for hours that she did not work.

Defendant was convicted of 29 counts of misappropriation of public funds and one count of embezzlement. Defendant now contends as follows:

1. The prosecutor committed misconduct and violated his state and federal constitutional rights by impugning the integrity and motives of defense counsel.

2. The prosecutor committed misconduct by improperly shifting the burden of proof to defendant.

3. The trial court erred by failing to grant his motion for new trial based on the instances of prosecutorial misconduct.

---

[1] Ochoa was tried with Lopez but she is not a subject of the instant appeal. Counts 31 through 34 in the information pertained only to Ochoa.

2

4.      Cumulative errors warrant reversal.

5.      As a matter of law, he could only be convicted of one count in connection with his behavior in counts 1-30 because all of the "thefts" were committed pursuant to one intention, general impulse and plan.

We affirm the judgment.

I

PROCEDURAL BACKGROUND

Defendant was charged in counts 1 through 3, 6 through 12, 14 through 27, 29 and 30, [2] with misappropriation of public funds in violation of Penal Code section 424, subdivisions (a)(1) and (a)(3).[3] He was charged in count 28 with embezzlement in violation of section 504 exceeding an amount of $400. It was further alleged that the embezzlement was of public funds within the meaning of section 514. It was further alleged that he damaged or destroyed property exceeding the value of $65,000 within the meaning of section 12022.6, subdivision (a)(1).

Defendant was found guilty of all counts except count 15. The special allegations were found true. Defendant's motion for new trial was denied. Defendant was sentenced to four years on count 1, eight months on count 28, one year for the section 12022.6, subdivision (a)(1) allegation, and one year on count 29. Defendant was sentenced on the remaining section 424, subdivision (a) (1) convictions to three years on each count and

---

[2]      The People amended the information after its case-in-chief to omit counts 4, 5 and 13.

[3]      All future statutory references are to the Penal Code unless otherwise indicated.

3

the sentence on these counts was ordered to run concurrent to count 1. He received a total sentence of six years and eight months in state prison. He was ordered to pay $184,322 in victim restitution pursuant to section 1202.4, subdivision (f).

II

FACTUAL BACKGROUND

For ease of reference, counts 1 through 23 involved false invoices submitted by Romans for repairs to yellow buses. Counts 24 through 27 involved the misappropriation of funds based on taking automobile parts ordered from NAPA from 2004 to 2007. Count 28 was embezzlement of the funds connected with counts 24 through 27. Counts 29 and 30 involved the overtime memorandums that defendant had created for his girlfriend, Ochoa.

A.      *People's Case-in-Chief*

1.      *Background*

The department was located on the Coachella Valley High School property in Thermal. The department managed two fleets of vehicles. The yellow fleet was all of the school buses. The white fleet was vans or other vehicles owned by the district. Between 2003 and 2007, there were about 200 vehicles in the white fleet and about 100 buses. Defendant was the director of transportation and oversaw the different fleet supervisors. Ochoa was employed by the department to train persons who drove either school buses or vehicles that were part of the white fleet. Ochoa had a long-term relationship with defendant.

4

## 2. *Counts 24-27 – NAPA convictions*

On August 15, 2005, Efren Tenorio was hired as a transportation fleet supervisor. Defendant was his boss. Tenorio was responsible for maintenance of the district's vehicles, including repairs and ordering supplies. Small repairs to the yellow buses were completed in the shop in the department. Tenorio was authorized to order parts for repairs. Once the part was ordered and received, invoices for payment were sent to the district.

Tenorio ordered some parts from NAPA. Defendant ordered parts on his own. Tenorio thought this was unusual because it was his job to order parts. If defendant ordered parts, Tenorio would have the delivery sent to defendant's office. Tenorio had never seen defendant give those parts to any of the mechanics in the department. A majority of NAPA invoices for parts that were received between 2003 and 2007, were received by defendant and approved for payment by him.

In late 2006 or early 2007, Tenorio discovered a NAPA part for a large truck that had been ordered and authorized for payment by defendant. It was part of an engine kit but there was no record that it had been installed on a district vehicle. Tenorio asked defendant about the part. Defendant told him it was a computer software program but Tenorio already knew it was an engine part. Tenorio also discovered there were NAPA parts that were ordered that were not for district vehicles. Defendant had authorized payment for these parts. Tenorio reviewed an online history of parts purchased and returned, and it did not match the department's inventory.

Fernando Diaz worked for the department for almost 30 years and left in 2005. He was the fleet supervisor for several years before he retired. Defendant was his boss. Diaz and all the mechanics could order parts needed to make any repairs. During this time, they did not track who ordered parts. Diaz recalled that he and defendant picked up parts from NAPA together over 100 times. Diaz signed for parts about half of the time.

Diaz would not sign invoices for parts, including foreign parts, which he knew were not parts for vehicles in the fleet. On occasion he took these parts to defendant. He did not know where the parts went or where the invoices ended up. It "surprised" Diaz that 95 percent of the invoices for the fiscal year 2004 through 2005 were signed by defendant. These included parts that Diaz said did not belong to vehicles in the fleet. Diaz never saw defendant take a part to use for himself but admitted he was aware that defendant ordered NAPA parts for his own side jobs.

Maria Urbano worked as a dispatcher in the department from 2001 until 2008. She had also worked as a clerk in the department preparing invoices to pay for parts. Urbano had seen invoices for parts for foreign cars, such as Toyotas, Hondas, and Nissans while defendant was the director. There were no foreign cars in the department's fleet. Urbano asked defendant about the parts and he told her not to worry about it. He promised to fix the error.

Enrique Contreras had been a full-time mechanic in the department since 2000. Between 2003 and 2007, there were persons assigned to order parts but there was no particular protocol; anyone could order parts. The white fleet had no foreign-made cars so he had no idea why the department would order parts for this type of car. Contreras

6

confirmed that his signature appeared to be forged on some of the NAPA invoices that showed he received these parts. One of the invoices was for paint that he would not order because there was no painting done in the shop. Genaro Castro, a mechanic employed by the department, also indicated that his signature was forged on several of the invoices for receiving parts from NAPA.

Sergio Duran was also a mechanic. He recalled seeing parts come into the shop that did not go to any of the vehicles in the fleet. The parts would then disappear and Duran did not know what happened to them. Duran would sometimes sign for the parts even though he knew they were not proper for the fleet. Duran saw defendant working on Ochoa's vehicle on a Saturday at the shop. Defendant appeared startled. The locks were changed that following Monday and Duran no longer had access on the weekend.

Maria Cervantes worked as a clerk/typist for the department starting in 2002. She also assisted Diaz. At one point in 2004 or 2005, Diaz refused to approve payment of invoices for parts. He told Cervantes that he did not "want to contribute to this."[4] Defendant started authorizing payment by signing the invoices for parts and then the invoices were sent to the district. Defendant instructed Cervantes that any packages from NAPA should be placed on his desk and not be opened.

Several mechanics employed by the department represented that there was no requirement in place between 2003 and 2007 that required a supervisor to order parts. If

---

[4] Diaz denied that he ever refused to sign invoices.

7

a supervisor was unavailable, a mechanic could order parts. None of the mechanics had ever asked defendant to order a part for them.

Angel Vazquez was a manager at the NAPA store. He reviewed several of the department's invoices. There were numerous invoices that were for parts to foreign-made cars. There were also invoices for painting supplies. Vazquez could only recall seeing four invoices that involved the return of parts. The invoices he reviewed had all been billed to the district account and had not been paid with cash.

Robert Austin had extensive experience in driving school buses and evaluating buses for transportation agencies for repairs. He worked as a consultant for schools.[5] Austin was hired by the district in 2006 to evaluate the department. Austin discovered there had never been an inventory of the parts in the department. The department was run with very little written documentation. The shop was the worst Austin had seen.

During Austin's investigation, Tenorio advised him that he had been able to access all of the invoices from NAPA of the parts purchased by the department and he was concerned that they did not match the parts in the department. Austin went to the district and obtained their records for invoices from NAPA. Austin was concerned because a number of the invoices were only signed by defendant. Austin discovered invoices for paint but had been advised that no paint work was done by the department. Austin found no paint in the shop at the department. Based on Austin's review of the parts being

---

[5]     Austin was subjected to a conditional examination because he was too sick to appear in court. A transcript was read to the jury.

ordered from NAPA, he concluded that defendant was ordering parts for some other purpose and having the district pay for them.

Maria Holm was a certified fraud examiner trained to examine any irregularity or misappropriation in financial documents. Her company was hired by the district to investigate problems with invoices in the transportation department. Holm started her investigation on March 12, 2007.

Holm reviewed the invoices from NAPA. Many of the parts ordered were for vehicles that were not part of the department's fleet, including parts for foreign and domestic vehicles. Holm determined there were at least one dozen parts ordered, which were authorized by defendant, which did not belong to vehicles in the fleet. After her investigation, she recommended that the issue be referred to law enforcement.

Ruth Creed was a document examiner employed by the Riverside County Sheriff's Department. She had extensive experience in handwriting analysis. She compared handwriting for defendant, Ochoa, Castro and Contreras. NAPA invoices that she was shown (61 in total) that were purportedly signed by Castro and Contreras were in fact not their signatures.

Riverside County District Attorney's Office Investigator Jeff Chebahtah was assigned to the public integrity unit which investigated reports of embezzlement or other wrong doing by public officials or employees. He was assigned to investigate defendant on July 9, 2007.

Investigator Chebahtah reviewed over 1,000 NAPA invoices from 2003 through 2007. He focused on those that had been signed by defendant, and the invoices that had

signatures for Castro and Contreras that appeared to be fraudulent. For fiscal year 2003 through 2004, defendant authorized payment of invoices for parts totaling $24,546.25. For 2004 through 2005, there were invoices that totaled $24,815.37. For fiscal year 2005 through 2006, there were a total of $26,468.72 in suspicious invoices. For fiscal year 2006 through 2007, the total was $35,491.69. Investigator Chebahtah discovered that all of the invoices for foreign-made parts were signed by defendant.

Marjorie Casagrande was an accounting manager employed by the district. She was the account manager for the department. The department was funded by public funds.

Linda Aguirre had taken over as the director of transportation after defendant was removed from the position. She had previously been the operations supervisor from 2000 to 2007. Defendant was her boss. Aguirre was aware that defendant repaired vehicles as a side job. Aguirre had her vehicle fixed by defendant. She believed the parts used on her car were purchased from NAPA.

### 3.    *Counts 1-23 – Repair of buses by Roman's Auto Body*

Gregorio Zarate had owned Romans for 18 years. Romans was located in Indio and its employees performed auto body work.[6] Zarate approached defendant about performing work for the department because his business was slow. Defendant started sending vehicles from the white fleet to Romans. Defendant then sent buses.

---

[6]    Zarate was granted immunity to testify.

10

In the beginning, Zarate would perform the work on the white fleet and bill the district. Once Zarate began working on the yellow fleet, defendant asked Zarate to provide false invoices. Defendant advised Zarate that he wanted Zarate to claim he was working on a bus for the department and then submit a false invoice for repairs to the district. Defendant instructed Zarate to give him a portion of the money he made from the false invoices. Zarate explained that defendant would call him and tell Zarate to come to the department and take down the information on a bus. Defendant told him to create an invoice for repairs. Defendant signed the fake invoices authorizing the repair. Defendant took 80 to 90 percent of the money. Zarate kept the rest of the money.

Zarate was shown repair invoices that were prepared by him. Zarate recalled that for 13 buses, numbers 1, 4, 7, 21, 22, 27, 28, 67, 81, 89, 90, 92, and 107 he did not do the repairs that he claimed on the invoices. These invoices totaled over $40,000. Zarate had told Investigator Chebahtah he did not do the work on bus 39. He insisted he worked on bus 18.

Austin investigated the buses. He first noted that the charges from Romans seemed to be more than the normal amounts charged for auto body work. Austin started matching the invoices with buses in the yard to determine the work that had been done. Austin took pictures of the buses to match each bus with the alleged repairs. When Romans had done work on a bus, it was "sloppy" work so it was easy to see if the work had been done. Austin also looked at the daily driving logs which were filled out by the bus drivers that showed if a bus was out of service. The driver was supposed to fill out a vehicle inspection report including information whenever a bus was being repaired.

11

Based on Austin's review, no repairs were completed on 8 buses; numbers 1, 4, 7, 11, 13, 21, 22, and 26, but the district paid for the repairs. Defendant authorized payment for these "repairs" by Romans. On bus 9, some repairs were done but the labor cost was high. The district was billed for the same parts and repairs on bus 18 by both A-Z Bus Sales and Romans. Romans did some of the work it billed for on bus 18 but not all of the work. The work it did was substandard and Austin would not have paid for it.

Buses 27, 28, 34, 81, 89, 90, 92, 101, 106 and 107 also had not been repaired despite Romans submitting an invoice that repairs were done and the district paid for the repairs. Defendant authorized payment for the repairs on these buses. Bus 39 had been sold on July 12, 2006. Romans submitted an invoice that it repaired the bus on July 11, 2006. It would be unusual to fix a bus before selling it. Bus 67 had shoddy repairs for which Austin would not have paid.

For all the repairs, the fleet insurance carrier only had a claim on bus 18. Austin took the invoices for Romans to the district. Defendant was immediately suspended.

Investigator Chebahtah executed a search warrant for Romans. He spoke with Zarate. Zarate initially stated that he had done the repair work he billed for. Zarate eventually admitted that the invoices he submitted were fraudulent. He admitted receiving payment from the district for buses he did not repair. Zarate gave defendant about 75 percent of the money and kept the rest. He estimated it involved eight to ten buses.

Investigator Chebahtah interviewed Zarate a second time. Zarate admitted that he had an arrangement to fill out invoices and give them to defendant. He would get paid

12

and cash the checks at a mini market. He would then give defendant a portion of the money.

Defendant had instructed the fleet supervisors that only Romans could do the auto body work. Tenorio indicated that Romans did a poor job on repairs. Tenorio mentioned the poor workmanship to defendant. Defendant advised him that Romans was the cheapest vendor and that they had to continue using him.

Tenorio recalled one particular incident involving bus 18. Tenorio had two invoices for repairs on bus 18 from both A-Z Bus Sales and identical invoices from Romans. Romans also invoiced for the labor on the repairs. The invoices were paid for by the district and were authorized for payment by defendant. There was an invoice from Romans for replacement of a "right side door." The buses only had left side doors. Defendant authorized the payment. Further, a glass company had submitted an invoice for glass repairs and Romans submitted an invoice for the same glass repairs.

In 2008, Contreras told Investigator Chebahtah that since 2005 only six buses had been sent to Romans for repairs.

### 4. *Counts 29 and 30 – Ochoa overtime counts*

Toby Zermeno was a trainer and dispatcher employed by the department from 2000 to 2010. Defendant approved any overtime that she and the other trainers accrued. On one occasion, Zermeno turned in her overtime sheet and defendant asked her to fill

out an additional one with Ochoa's name to reflect the same hours. Zermeno knew that Ochoa had not worked the 34 hours of overtime that was on the sheet.[7]

     5.     *Other evidence*

Augustine Casino was about one mile from the department. Tenorio had observed defendant gambling at the casino. Doyle Johnson worked at the Augustine Casino. Defendant was a VIP member at the casino and would use a card whenever he gambled in order to receive complimentary items. Johnson compiled all of the gambling records for defendant at the casino. Between 2003 and 2007, he had gambled over $100,000 at the casino.

Urbano stated that there were vending machines in the department and the Coca Cola Company issued checks made out to the district to give them some of the proceeds of the vending machine. At some point, defendant advised Coca Cola to write the checks directly to him. Zermeno had cashed checks made out to defendant by Coca Cola.

B.     *Defense*

Defendant started working for the district in 1978 as a night custodian. In 1981, he then moved to being a mechanic in the department. He had been a fleet supervisor and was an interim director for several months prior to becoming the director in March 1999. Defendant had no management experience. He went to a seminar given by Austin.

---

     **7**     Defendant was tried with Ochoa so there was significant evidence presented regarding overtime. However, for defendant, the prosecutor relied exclusively on Zermeno's testimony presented in its case-in-chief and rebuttal, which will be set forth, *post*, as the evidence supporting the convictions in counts 29 and 30.

14

Defendant had asked Austin to come to the department to help based on an increase in the number of employees and buses, and no increase in office staff.

There was a lot of theft of parts from the shop so defendant recommended that security cameras be installed. He had to use a person who also drove a bus most of the time to order parts. Defendant claimed the district would not hire a parts person, even though he requested one all of the time, and he did not have the authority to hire anyone without the district's authorization. He admitted that without a parts person there was very little accountability for the parts ordered.

Defendant indicated there were additional documents called "green sheets" filled out by drivers that had information about bus use and damage. These green sheets were used by the bus drivers to do a mandated pre-trip inspection every morning. These sheets had not been introduced by the People. Defendant claimed to have requested the sheets from the district but they were never given to him.

Defendant did not regularly order parts from NAPA. Defendant picked up parts from NAPA for the department because he wanted to take smoke breaks and could not smoke on department property.

Zarate came to defendant and offered his services to fix the buses. The department would order the parts that Zarate needed to fix both the buses and white fleet vehicles and give the parts to Zarate in order to decrease costs. Defendant claimed that if a district employee got in an accident with a non-district vehicle, that person's vehicle would be repaired at Romans and the district would provide the parts. He looked at invoices involving parts for several cars that he approved for payment which included

15

cars not part of the white or yellow fleet. Defendant claimed they were repaired because they had been hit by a district bus or vehicle. He also claimed some parts were returned. Any repairs that were less than $8,000 were handled by the department and not reported to insurance.

He claimed he signed invoices with just part numbers that he did not know belonged to foreign vehicles. Castro would use paint in the shop at the department. He claimed the mechanics painted hoods and doors. Defendant was aware the department was not supposed to do painting based on environmental regulations. He signed Contreras's and Castor's names to invoices for parts that they ordered so he could track who ordered the parts.

Zarate had never given him money and defendant had never asked Zarate to put together false invoices. Defendant had Zarate correct poor work he had completed. Defendant never doubted that Zarate did the work he was given.

Defendant reviewed some of the photographs taken by Austin during the investigation of the buses. Defendant claimed he believed the buses had the repair work completed on them. The parts ordered from A-Z Bus Sales for bus 18 were returned because they were the wrong type of parts. He was not given an invoice for the return by the department. Photographs taken by Austin were not good enough to tell if the repairs had been completed or it appeared to him the work was done on some of the buses. Defendant disagreed with Austin.

16

Defendant claimed that the CHP inspected the buses on a regular basis and would cite them for any mismatched paint or other body damage. Those buses would have to be repaired.

Aguirre was supposed to review the overtime sheets before giving them to defendant. Defendant just signed them. Defendant signed the Coca Cola checks and gave them to his secretary. He did not know where the money went.

Defendant indicated that there were 3,000 employees in the district and two-thirds of them had to complete training to drive district vehicles. He had subpoenaed white fleet training records that he insisted were created when the employee receiving the training would sign a sheet. He only received the records for 2006 through 2007 and not the entire amount for the years proceeding that year. Ochoa did most of the training for the white fleet in 2006 through 2007. Up until 2005, Ochoa was in charge of compiling all of the bus driver's timesheets; it was a lot of work and she had to complete them on the weekends.

Defendant went to the Augustine Casino on occasion. He had several VIP cards given to him by the casino and he allowed other people to use them to gamble. He wanted them to use the cards so he would receive complimentary items at the casino. He did not gamble the amount alleged by the casino. He did not recall that he told Investigator Chebahtah that he lost $35,000 a year.

He admitted he fixed cars outside of work at the department. He paid for parts that he used.

He admitted signing for the receipt of over 600 NAPA parts. Defendant denied he went to NAPA to pick up parts two to three times each week by himself. He claimed that he did not give the parts he picked up to the mechanics personally; he would leave them in the van for them to retrieve when they needed them.

C.    *Rebuttal*

Investigator Chebahtah interviewed Young. He said Ochoa rarely worked overtime.

Zermeno was recalled. Zermeno stated she had actually filled out fraudulent overtime sheets at defendant's request. She filled out one using her own hours on November 23, 2004, at the direction of defendant. She knew Ochoa had not worked those hours. A second time, on July 25, 2005, she filled out another overtime sheet for Ochoa at defendant's direction. Defendant told Zermeno just to make up the hours. Zermeno had given cash to defendant after cashing the Coca Cola checks. Tenorio was recalled. After defendant was put on leave, Tenorio was able to hire a parts person.

III

PROSECUTORIAL MISCONDUCT

Defendant makes two claims of prosecutorial misconduct. First, he claims that the prosecutor impugned defense counsel's credibility by advising the jury that she had not subpoenaed documents to support the defense that the district conspired against defendant although he was aware that defense counsel had attempted to subpoena the documents. Second, he claims that the prosecutor shifted the burden of proof to him by arguing that defendant failed to support his claim by documentary evidence.

18

A.      *Additional Factual Background*

The jury was instructed prior to the presentation of evidence that, "Nothing that the attorneys say is evidence.  In their opening statements and closing arguments, the attorneys will discuss the case, but their remarks are not evidence.  Their questions are not evidence."

During defense counsel's argument, she referred to the prosecutor's argument during the opening that she had not obtained all of the relevant records in the case. Defendant's counsel argued, "I'm supposed to object if anybody even infers that we're supposed to do anything in our defense.  It is the prosecution's entire burden.  But, believe me, we tried to get stuff.  Okay."

In rebuttal, the prosecutor first advised the jurors that he had the burden of proof, "but you also have a reasonable expectation that things are proven to you."  The prosecutor criticized defense counsel for failing to present any witnesses to support that there was a conspiracy against defendant.  There was no objection.

The prosecutor then argued, "Also, [defendant] and [defense counsel] have suggested to you on a number of occasions that, 'Well, to the extent that we're not able to establish something that we want to prove to you, it's because we didn't get the records. We tried to get the records, but we couldn't get the records.'  That - - that is particularly disturbing, ladies and gentlemen, for a lot of reasons, but I'll - - I'll tell you - - or I'll suggest to you what I think it's meant to do, those types of statements:  It's meant to support this notion that there was some conspiracy against [defendant]; that somehow; because the district had it out for him, that they - - they refused to provide documents

19

which would have helped him; because the government is somehow against him, that the government is preventing him from receiving documents that might be helpful to his defense. [¶] I mean, there were things that were said, like, 'Well, we don't know what happened; there's not enough records. We tried to get them.' [Defense counsel] at one point said, 'Oh, believe me, we tried to get them. We tried to get that stuff.' Well, first of all, what the attorneys say is not evidence. So just because [defense counsel] said, 'We tried to get them,' doesn't mean anything."

The prosecutor also referred to defendant's testimony. "But [defendant] did say a couple of times, 'Well, we tried - - we tried to get records.' Well, as jurors who are as diligent as I know you will be, you should expect some corroboration to that statement. Again, I have the burden of proof, but when someone makes a statement like - - as important as a statement like that, as important as [defendant] is in this case, you would expect that there would be some sort of corroboration for that. [¶] So where is the subpoena? Where was the subpoena that should have been presented to you, showing you that a request was made for all these various documents that [defendant] says he tried to get? [¶] Where is the custodian of records for the entity, like the district, who should have come here and testified, if this were really true, who should have been subject to direct examination and cross-examination? Where is that person to come in here and explain to you what it is that was given over and what it is that wasn't given over and the reasons why? [¶] You should expect to hear from people like that before you believe wholeheartedly some claim that 'We tried to get some stuff but they wouldn't let us get it.'"

20

At this point, defendant's counsel interjected, "Your Honor, I might have to be addressed on this one." The trial court responded, "Overruled." The trial court advised the jury, "This is argument, remember, ladies and gentlemen." The prosecutor immediately stated, "Again, the People have the burden of proof, . . ."

The prosecutor continued his argument as follows: "[B]ut you as jurors should expect - - when a proposition is given to you, expect to have some form of corroboration, because you're not required to accept wholeheartedly anything that anybody says. They want you to question every bit of evidence that suggests that he might be guilty; I ask that you question every bit of evidence, including things that [defendant] says." [¶] You see, when attorneys - - one of the wonderful things that we get to do once we get our bar card is we get to subpoena people; right? We get to subpoena people to come into court, and we get to subpoena records. That's how we get documents. [¶] So if, in fact, a request was made for a bunch of records that didn't get received, wouldn't you expect to hear from these people? Wouldn't you expect to see the subpoena? Wouldn't you expect to see something to substantiate this claim that they asked for records and didn't get them?" [¶] Who is 'they'? Would that include the district transportation department? The human resources division within the transportation department? Would that also include the CHP? Would that include the district attorney's office? Would that include everyone who ever provided documents in this case? We're all in this great and grand conspiracy to somehow implicate [defendant] when he really didn't do anything wrong? [¶] I mean, that's how far-reaching this must be in order for you to believe that particular thing that [defendant] said. And that's - - that's not reasonable."

21

The prosecutor argued as to the records on the buses as follows: "Another thing - - [defense counsel] went through a great effort to suggest this to you on many occasions: I think her statement was, 'Here we go again. We only have partial records as it relates to the buses,' as if to say that, 'Well, if we had these other records, we'd be able to show you something.' [¶] The reality is there are no other records, and there is no proof that they requested records that they didn't get. There is no proof that there were other records that they didn't get. You have what is in existence, and that's what you base your verdict on, the evidence. Not on the proposition of the notion that there could be some other evidence out there that they didn't get."

Defense counsel objected on the record that this was deliberately misleading and wanted to address the court later regarding the remarks. The prosecutor objected that it was inappropriate commentary during his closing argument. The trial court stated, "It is inappropriate. So just make your objection." Defense counsel responded, "I will. I will make an objection and ask the court to hear it later." The prosecutor then stated, "Reasonable minds may differ. I ask you to look to the evidence, and that's all. And, again, I have the burden of proof. You should expect corroboration where there is some proposition given to you."

The prosecutor also referred to the training records for the white fleet drivers that were missing and that defendant had not presented the testimony of a white fleet driver about training during a time other than normal working hours. The prosecution argued, "Again, I have the burden of proof, but before you believe an assertion like that, I mean, shouldn't you - - you're well within your rights to want some corroboration. And you

didn't hear from one white fleet driver out of the - - I think they had like 63 forms or something. How do we know that those didn't happen within regular business hours? How do we know that? They could have very well happened within regular business hours, but [defendant's counsel] wants you to believe they happened outside of regular business hours. Where is the proof? [¶] And then she suggests to you, 'Well we tried to get all those records too.' Where is the proof she tried to get all of those records?"

Defendant's counsel interrupted and stated, "I want that marked as well." The prosecutor once again immediately stated, "Again, I have the burden of proof. Okay. I want that to be clear. But you have the ability - - well, you should want to substantiate some things that are claimed by the defense, just like you would want to do the same for the People."

At the break, before the concluding instructions, defense counsel argued that the prosecutor knew that she had issued subpoenas for documents to support the defense. She issued subpoenas to both the district and department. Defense counsel referred the trial court to all of the continuances in the case which were required because she was waiting for documents. Boxes of documents that had been sent to the court were based on the subpoenas she had issued. Defense counsel stated, "I mean, I don't have a problem with him saying - - even though we don't have to produce anything - - that 'They didn't bring these people, you know, to say this or that.'"

The prosecutor responded, "Your Honor, the - - the point that I was trying to make with my argument was that it was really addressing the implication for [defense counsel's] argument that the district did not provide records that were in existence as a

23

part of this grand conspiracy theory. I mean, that was my argument, whether they believed it or not. [¶] My argument was 'The defense wants you to believe there's a conspiracy. Somehow, the fact they didn't receive documents - - certain documents from the district were in an effort by the district to not provide them on purpose.' And that's, I believe, argument. I didn't phrase it in that way exactly, but I don't remember ever saying that they didn't subpoena records. [¶] What I suggested was that they should have produced witnesses and the subpoena to establish and corroborate the defendant's testimony that this happened, and that - - also bring in people like the custodian of records to support the notion that there were records in existence that were not provided to the defense."

The trial court responded that it recalled the argument as being that the prosecutor was not even sure whether defense counsel subpoenaed the records. The prosecutor stated that it was not trying to imply that and the trial court responded, "Well, [prosecutor], what you're trying to imply and what you're implying may be two different things." The trial court asked defense counsel what she was requesting. She responded, "Well, I guess maybe we could do one of two things: I guess we could get the actual subpoenas and mark them as exhibits, or - - you know, I don't know how to fix that. I don't know what to do about it."

The trial court referred to the prosecutor's comment during argument, "'Where is the subpoena?'" The trial court also advised the parties that it found a subpoena in a box of materials that was sent to the court. The prosecutor stated that he was merely arguing that defendant's arguments had to be corroborated by documentary evidence. The trial

24

court responded, "You took a shotgun approach to [defense counsel's] credibility. You told the jury, 'Don't believe her when she says she subpoenaed the documents. 'You didn't say, 'Don't believe her because we don't have any proof that she subpoenaed the CHP documents,' or 'Don't believe her because she didn't subpoena these documents.' You just said, 'Don't believe [defense counsel] because there's nothing to corroborate her. Where's the subpoena?' That's what you said: 'Where's the subpoena?'"

The trial court asked defense counsel what she was requesting and she responded, "I don't know." The prosecutor tried to argue but the trial court did not let him make a statement, admonishing him that "[t]here's been a course of conduct by you misrepresenting things during the course of this trial: . . . ."[8] Defense counsel requested the following remedy: "What I would ask for is one of two things: Either to have my subpoenas marked or have the court take judicial notice of them and say that the defense on behalf of [defendant] did subpoena documents from [the district] on this date and this date." The trial court asked her for the subpoenas. She did not have them. The trial court could locate only one subpoena. Defense counsel was satisfied with the one subpoena because it included the request for the bus drivers' green sheets, and the white fleet drivers' training records.

Ochoa's counsel argued that the prosecutor's argument also shifted the burden of proof to the defendants. The trial court noted that the failure to call logical witnesses was proper argument. The trial court stated, "What the court feels was improper is impugning

---

**8**      The prosecutor later made a record that he disagreed with the trial court that he had misled the jury.

25

the integrity of opposing counsel by saying her statements, you know, besides being not evidence, her statements are not supported by any documentation that says she's being truthful to the jury, and giving the impression that she's not being truthful to the jury."

The trial court then stated the admonishment it was going to give to the jury as follows: "Well, I was just going to indicate that 'It appears that certain records were subpoenaed by the defense, even though it may have been - - you may have gotten the impression during the argument that they weren't subpoenaed by the defense. And you have a copy of the subpoena, and it will be admitted into evidence for you to look at.'" Defense counsel responded, "Okay."

The trial court then advised the jurors as follows: "Ladies and gentlemen, during the arguments, there was some implication that [defense counsel] had not subpoenaed some documents. And so we've - - there'll be a subpoena duces tecum included in the items of evidence that you can look at. A subpoena duces tecum is a subpoena for documents. And - - to look at that to evaluate that issue."

B.    *Standard of Review*

"'"The applicable federal and state standards regarding prosecutorial misconduct are well established. '"A prosecutor's . . . intemperate behavior violates the federal Constitution when it comprises a pattern of conduct 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.'"' [Citations.] Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves '"'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.'"' [Citation.]"

26

[Citation.]' [Citation.]" (*People v. Zambrano* (2004) 124 Cal.App.4th 228, 241 [Fourth Dist., Div. Two].)

"[A] determination of bad faith or wrongful intent by the prosecutor is not required for a finding of prosecutorial misconduct. [Citation.]" (*People v. Crew* (2003) 31 Cal.4th 822, 839.) Rather, the issue is whether "the defendant's right to a fair trial was prejudiced by the remark [citation]." (*People v. Epps* (1981) 122 Cal.App.3d 691, 706.) "[A]n appellate court reviews a trial court's ruling on prosecutorial misconduct for abuse of discretion. [Citation.]" (*People v. Alvarez* (1996) 14 Cal.4th 155, 213.)

C.    *Forfeiture*

Initially, respondent argues that defendant failed to make a timely objection to the comments and has therefore forfeited his claim. "'"'[A] defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion — and on the same ground —the defendant made an assignment of misconduct and requested that the jury be admonished to disregard the impropriety. [Citation.]"'" [Citations.]" (*People v. Pearson* (2013) 56 Cal.4th 393, 426.) While defense counsel did not state the grounds of her objection on the record at the time the comments about the subpoena were made, she did make a comment on the record and later brought the alleged misconduct to the trial court's attention. Moreover, defendant has claimed that if we find he has forfeited the claim, he received ineffective assistance of counsel. We will address defendant's claim.

D.    *Misconduct*

Initially, as to the comments by the prosecutor about defense counsel's failure to subpoena records, it is clear that the trial court found misconduct had occurred. We agree

27

with the trial court that the prosecutor's comments could reasonably be interpreted to be that defense counsel did not attempt to subpoena records and that constituted misconduct.

"'It is settled that a prosecutor is given wide latitude during argument. The argument may be vigorous as long as it amounts to fair comment on the evidence, which can include reasonable inferences, or deductions to be drawn therefrom. [Citations.]'" (*People v. Wharton* (1991) 53 Cal.3d 522, 567-568; see also *People v. Williams* (1997) 16 Cal.4th 153, 221.) It is also settled that, while "[t]he prosecutor's argument cannot refer to the absence of evidence that only the defendant's testimony could provide," fair comment "on the failure of the defense to introduce material evidence or to call logical witnesses" is permitted. (*People v. Brady* (2010) 50 Cal.4th 547, 565-566.)

"'A prosecutor commits misconduct if he or she attacks the integrity of defense counsel, or casts aspersions on defense counsel.' [Citations.] 'In evaluating a claim of such misconduct, we determine whether the prosecutor's comments were a fair response to defense counsel's remarks' [citation], and whether there is a reasonable likelihood the jury construed the remarks in an objectionable fashion [citation]." (*People v. Edwards* (2013) 57 Cal.4th 658, 738.)

Here, it was proper for the prosecutor to argue to the jury that no evidence was presented by the defendant to show that the district intentionally withheld documents, and that no logical witnesses were presented to corroborate defendant's claim that there was a conspiracy to get rid of him. However, it is reasonably inferred from the prosecutor's argument that defense counsel made no effort to subpoena records to support the claim when in fact the prosecutor was aware that she had attempted to subpoena these

28

documents. This constituted misconduct in that the prosecutor was well aware of defense counsel's efforts to subpoena documents.

As to the shifting of the burden in this case, that is not supported by the record in this case. Initially, as stated, *ante*, the prosecutor could comment on the defendant's failure to call logical witnesses. (*People v. Brady, supra,* 50 Cal.4th at p. 566.) Moreover, the prosecutor repeatedly admonished the jurors that the People had the burden of proof in the case. This was appropriate argument and does not constitute misconduct.

E.    *Prejudice*

Despite the one instance of misconduct by the prosecutor, this misconduct was not prejudicial. Prosecutorial misconduct violates a defendant's federal Constitutional rights when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process. (*People v. Gionis* (1995) 9 Cal.4th 1196, 1214; *People v. Hill* (1988) 17 Cal.4th 800, 819.) We reject that the comments made by the prosecutor about the lack of a subpoena violated defendant's federal Constitutional rights. A majority of the argument was properly addressed to the failure to call logical witnesses and present documentary evidence, which was legitimate argument. The brief references to the lack of subpoena did not infect the trial with such unfairness to make the conviction a denial of due process.

Prosecutorial misconduct that violates state law is only cause for reversal when it is reasonably probable that a result more favorable to the defendant would have occurred

had the district attorney refrained from the untoward conduct. (*People v. Milner* (1988) 45 Cal.3d 227, 245.)

The trial court here gave an appropriate curative instruction. The jury was given the subpoena. Counsel agreed at the time that this was sufficient as it included the requests for "green sheets" and the white fleet training logs. Based on the curative instruction, it is not reasonably probable a result more favorable to defendant would have been reached absent the comment. In fact, it was prejudicial to the People as the jury could reject all of the prosecutor's argument believing he had lied in his entire argument.

Defendant, relying upon *People v. Hill, supra,* 17 Cal.4th 800, claims that the curative instruction did not cure any misconduct. However, the court in *Hill* rejected that any curative instructions or jury instructions could cure the misconduct because they found the prosecutor in that case engaged in a "pervasive campaign to mislead the jury on key legal points, as well as her unceasing denigration of defense counsel before the jury . . ." (*Id.* at p. 845.) No such "pervasive campaign" was evident here. As noted, the prosecutor could properly argue that defendant failed to present logical witnesses and failed to support the defense.

Moreover, the evidence of defendant's guilt was overwhelming and was not impacted by the comments regarding a lack of subpoena. As for the bus repairs, Zarate testified that he and defendant had a scheme for him to submit false invoices for repairs he did not do, and that he and defendant would split the proceeds. Austin photographed all of the buses and came to the conclusion the work had not been completed. Despite the work not being done, defendant authorized payment.

Moreover, the testimony and NAPA invoices overwhelmingly established defendant's guilt of misappropriating funds by ordering parts for his own use. Initially, several of the mechanics testified that they never asked defendant to order parts for them. Many of the parts signed for by defendant did not belong to vehicles in either the yellow or white fleet. Defendant picked up parts from NAPA even though they delivered the parts and he was the director. Several employees had their car fixed by defendant and he used NAPA parts in his outside work. It was also reasonable for the jury to infer that defendant had forged the signatures of Contreras and Castro on the invoices showing he did not want the parts traced back to him.

As for the counts involving Ochoa's overtime, Zermeno testified that she had prepared two overtime sheets for Ochoa that were fraudulent. This evidence was not contradicted.

Defendant rejects that the evidence of his guilt was overwhelming by arguing that his and his counsel's credibility were of "paramount importance" in the case. This does not address that credible testimony was given by Zarate and Austin that the bus repairs were not completed. Further, it does not contradict the numerous invoices signed by defendant for parts that did not go to yellow or white fleet vehicles in the case. Finally, it does not address Zermeno's testimony that she prepared two fraudulent overtime sheets for Ochoa at the behest of defendant.

Based on the foregoing, the misconduct by the prosecutor in this case did not render the trial unfair and the results would not have been more favorable to defendant

31

had the comments not been made.  We reject defendant's claim that his convictions must be reversed based on prosecutorial misconduct.

IV

DENIAL OF MOTION FOR NEW TRIAL

Defendant additionally claims that the trial court erred by denying his motion for new trial based on prosecutorial misconduct.

A.      *Additional Factual Background*

Defendant filed a motion for new trial pursuant to section 1181 and based on the non-statutory ground that he was denied a fair trial.  One of the grounds he argued warranted granting a new trial was that the prosecutor impugned the integrity of defense counsel by arguing that she had not subpoenaed records when he was aware of the subpoena.  Defendant argued that giving the subpoena to the jurors was insufficient to cure the error.  He additionally argued that the prosecutor improperly shifted the burden of proof to defendant by arguing that he should have produced evidence.  The People filed opposition denying that any misconduct occurred.

Defense counsel argued at the hearing on the motion that defendant was denied a fair trial based on the argument by the prosecutor that she had lied to the jury about the subpoenas.  The prosecutor was well aware of the subpoenas.  Defense counsel further argued the cure was not sufficient.

Another prosecutor appearing for the prosecutor in this case argued that there were no documents or witnesses to support the claim of conspiracy.  The trial court interjected at one point, "But he knew there was a subpoena."  The trial court considered this a

"personal attack on the opposing counsel." The trial court noted, "I don't have a problem with the not having - - not having the evidence. The tenor of the argument was an implication that [defense counsel] was not being honest when she talked about the subpoena, and that's what it boils down to. And he knew that she had attempted to subpoena the documents." The trial court also stated, "It was the Court's impression, when he was doing it, that it was a personal attack . . . " The trial court, after hearing additional argument, still concluded that the prosecutor made a personal attack on defense counsel.

The trial court ruled, "Well, the issue is whether or not absent misconduct there would have been a result more favorable to the defendant in the absence of that conduct by the prosecutor. And I find that it is not reasonably probable that the result would have been in any way different. [¶] This was a very strong case against your client, and these - - what the Court had felt was error that was committed by the prosecution - - would not have affected the results in any way. So I'm going to deny the motion for a new trial."

A.      *Analysis*

"When a verdict has been rendered or a finding made against the defendant, he may move for a new trial on various statutory grounds. . . . (§ 1181.)" (*People v. Guerra* (2006) 37 Cal.4th 1067, 1159.) Section 1181, paragraph (5), provides that a new trial may be granted when the prosecutor has "been guilty of prejudicial misconduct during the trial thereof before a jury." "'On appeal, a trial court's ruling on a motion for new trial is reviewed under a deferential abuse of discretion standard. [Citation.] Its ruling

33

will not be disturbed unless defendant establishes "a 'manifest and unmistakable abuse of discretion.'"" [Citation.]" (*People v. Homick* (2012) 55 Cal.4th 816, 894.)

As we have set forth extensively in the previous argument, we found that the prosecutor did not improperly shift the burden of proof to defendant and therefore no prosecutorial misconduct was founded on this ground. Moreover, as to the prosecutor's argument regarding subpoenas, we have concluded that such argument, although misconduct, was not prejudicial and did not render the trial unfair. As such, the trial court did not abuse its discretion by denying defendant's motion for new trial.

V

CUMULATIVE ERROR

Defendant contends that the cumulative effect of the errors that occurred at trial require reversal of his convictions, even if individually they were not sufficient to constitute prejudicial error.

Reversal may be required when the cumulative effect of serious trial errors made at trial amounted to a miscarriage of justice. (*People v. Hill, supra,* 17 Cal.4th at p. 844.) "Lengthy criminal trials are rarely perfect, and this court will not reverse a judgment absent a clear showing of a miscarriage of justice. [Citation.]" (*Ibid.*) It is impossible to guarantee a perfect trial. (*People v. Stewart* (2004) 33 Cal.4th 425, 522.)

In applying this standard to the circumstances in this case, although we have found one instance of prosecutorial misconduct, such misconduct was not prejudicial. We have found no other trial errors. Defendant received a fair trial and there was no cumulative prejudice.

CONVICTION OF MORE THAN ONE SECTION 424 (a) OFFENSE

Defendant finally contends that under *People v. Bailey* (1961) 55 Cal.2d 514

(*Bailey*), that he could only be convicted of one count for his actions in this case because

all of the crimes were committed with one intention, impulse and plan.  Since the briefs

were filed in this case the California Supreme Court decided the case of *People v.*

*Whitmer* (2014) 59 Cal.4th 733 (*Whitmer*).  In *Whitmer*, the court addressed *Bailey,* and

found that "a defendant may be convicted of multiple counts of grand theft based on

separate and distinct acts of theft, even if committed pursuant to a single overarching

scheme."  (*Whitmer, supra,* at pp. 735, 741.)  *Whitmer* declined to apply retroactively its

"new rule."  (*Id.* at pp. 735, 742.)  As a result, we must address defendant's claim under

the law existing before *Whitmer*.

A.      *Additional Factual Background*

During discussion of the instructions, defendant wanted to have the jury instructed

on the *Bailey* doctrine.  The prosecutor noted these were not grand or petty thefts; these

were different charges.  As such, the *Bailey* doctrine was not applicable to the case.

Without explanation, the trial court instructed the jury, "If you conclude that the

defendant [] committed more than one theft, you must decide if the defendant committed

multiple petty thefts or a single grand theft.  [¶] To prove that the defendant is guilty of a

single grand theft, the People must prove that:  [¶] 1.  The defendant committed theft of

property from the same owner or possessor on more than one occasion; [¶] 2.  The

combined value of the property was over $950; and, [¶] 3.  The defendant obtained the

property as a single overall plan or objective. [¶] If you conclude the People have failed to prove grand theft, any multiple thefts you have found proven are petty thefts." Defendant was convicted of multiple counts.

The trial court noted at sentencing that defendant had "three different schemes" to steal money from the district. There was the theft of auto parts; the false invoices for bus repairs; and Ochoa's overtime. The trial court stated that it was not going to apply *Bailey* to the charges because "that issue is very murky as to whether or not it applies or not."

B. *Analysis*

In *Bailey,* the defendant received welfare payments based on one fraudulent statement made by her. Each amount that she received amounted only to a petty theft, but the total amount of all the thefts constituted felony grand theft. She was convicted of one count of grand theft. (*Bailey, supra,* 55 Cal.2d at pp. 515-516, 518.) On appeal, the court concluded that a single conviction of grand theft was proper. The *Bailey* court held, "Several recent cases involving theft by false pretenses have held that where as part of a single plan a defendant makes false representations and receives various sums from the victim the receipts may be cumulated to constitute but one offense of grand theft. [Citations.] The test applied in these cases in determining if there were separate offenses or one offense is whether the evidence discloses one general intent or separate and distinct intents. The same rule has been followed in larceny and embezzlement cases, and it has been held that where a number of takings, each less than $200 but aggregating more than that sum, are all motivated by one intention, one general impulse, and one plan, the offense is grand theft. [Citations.]" (*Bailey, supra,* 55 Cal.2d at pp. 518-519.)

36

However, *Bailey* added additional language that, ""'Whether a series of wrongful acts constitutes a single offense or multiple offenses depends upon the facts of each case, and a defendant may be properly convicted upon separate counts charging grand theft from the same person if the evidence shows that the offenses are separate and distinct and were not committed pursuant to one intention, one general impulse, and one plan." (*Bailey, supra,* 55 Cal.2d at p. 519.) That language in *Bailey* was the subject of *Whitmer*, which concluded multiple *grand theft* convictions were proper because "defendant committed a series of separate and distinct, although similar, fraudulent acts in preparing separate paperwork and documentation for each fraudulent transaction." However, it also concluded that this was in conflict with numerous court of appeal opinions and refused to apply this ruling retroactively. (*Whitmer, supra,* at pp. 735, 741-742.)

Respondent contends that violations of section 424, subdivision (a) are not subject to the *Bailey* doctrine as the crime of misappropriating funds targets the manner in which defendant misused the district's funds, rather than the theft of a particular dollar amount that needed to be aggregated to make a greater crime.

Section 424(a)(1) makes it a crime to misappropriate public funds as follows: "Each officer of this state, or of any county, city, town, or district of this state, and every other person charged with the receipt, safekeeping, transfer, or disbursement of public moneys, who . . . [¶] 1. Without authority of law, appropriates the same, or any portion thereof, to his or her own use, or to the use of another . . . "The purpose of section 424 is to "protect the public purse." (*People v. Aldana* (2012) 206 Cal.App.4th 1247, 1257.) "'[T]he subject matter and the language of section 424 clearly indicate that the legislative

37

mind was intently concerned with the single, specific subject of the safekeeping and protection of public moneys and the duties of public officers in charge of the same.'" (*Ibid.*)

Respondent relies on *People v. Neder* (1971) 16 Cal.App.3d 846 to support his claim that *Bailey* does not apply to the crime of misappropriation of public funds. In that case, Neder and his codefendant used another person's credit card to make three separate purchases from the same store. Neder was convicted of three counts of forgery. (*Id.* at pp. 849-850.) On appeal, Neder argued there was only one offense committed within the meaning of *Bailey*, because there was a single intent and plan associated with the three forgeries. The Court of Appeal disagreed, explaining: "In the instant case it is probably true that the forgeries were motivated by a preconceived plan to obtain merchandise from Sears by use of [the victim's] credit card and by forging sales slips. However, we do not feel that the *Bailey* doctrine should be extended to forgery. That doctrine was developed for the crime of theft to allow, where there is a common plan, the accumulation of receipts from takings, each less than $200, so that the taker may be prosecuted for grand theft as opposed to several petty thefts. The essential act in all types of theft is taking. If a certain amount of money or property has been taken pursuant to one plan, it is most reasonable to consider the whole plan rather than to differentiate each component part. [Citation.] The real essence of the crime of forgery, however, is not concerned with the end, i.e., what is obtained or taken by the forgery; it has to do with the means, i.e., the act of signing the name of another with intent to defraud and without authority, or of falsely making a document, or of uttering the document with intent to defraud. Theft pursuant to

38

a plan can be viewed as a large total taking accomplished by smaller takings. It is difficult to apply an analogous concept to forgery. The designation of a series of forgeries as one forgery would be a confusing fiction." (*Id.* at pp. 852-853, footnote omitted.)

In *People v. Mitchell* (2008) 164 Cal.App.4th 442, the court applied the reasoning in *Neder* to find that the *Bailey* doctrine did not apply to violations of section 530.5, subdivision (a), which punishes "Every person who willfully obtains personal identifying information . . . of another person, and uses that information for any unlawful purpose, including to obtain, or attempt to obtain, credit, goods, services, real property, or medical information without the consent of that person, . . ." The *Mitchell* court relied on the fact that a violation of section 530.5 punishes for each "use" of the card and *Bailey* was concerned with whether a defendant could "avoid a charge of grand theft by breaking up [the] transactions into a series of petit thefts." (*Id.* at p. 455.)

In *Arthur V.* (2008) 166 Cal.App.4th 61, the court analyzed the cases involving the *Bailey* doctrine and came to the following conclusion: "In our view, the principal analytical distinction to be drawn in applying *Bailey* is not between theft and nontheft crimes (the rough distinction that has arisen in the case law), but rather between offenses that can be aggregated to create a felony offense, such as petty theft and misdemeanor vandalism, and those that cannot, such as burglary. The *Bailey* rule, thus, has application whenever, as here, a defendant is charged with a felony offense based on an aggregation of multiple misdemeanor offenses." (*Id.* at pp. 67-68, footnote omitted.)

Here, defendant's convictions for misappropriation of funds involved defendant failing to ensure the safety of the public funds and were not based on the amount of money taken. The act committed by defendant was the failure to protect public funds to which he had been entrusted, not the amount of money taken. This case is akin to *Mitchell*. Moreover, as argued by respondent, multiple convictions of misappropriation of funds cannot be aggregated into a single conviction of misappropriation of funds or a greater felony. Additionally, defendant was properly convicted of one embezzlement offense based on the total amount of the taking. We find that he could be convicted of multiple counts in counts 1 through 30.

## VII

## DISPOSITION

The judgment is affirmed in its entirety.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

RICHLI _____
                                                                                                    J.

We concur:

McKINSTER _____
          Acting P. J.

CODRINGTON _____
                    J.

40